COAL & COKE BY-PRODUCTS CO. v. ERNST et al.

(District Court, W. D. Pennsylvania. Feb. 10, 1914.)

No. 6.

1. PATENTS (§ 129*)—DENIAL OF VALIDITY—ESTOPPEL.

Where plaintiff claimed as assignee of defendant E., the patentee who thereafter became connected with defendant corporation, and as such contracted to manufacture a similar machine, and engaged defendant B. Company to construct the same, the patentee and his corporation were estopped to deny the validity of plaintiff's patent, and the B. Company was also subject to such estoppel so far as the machine it had contracted to build constituted an infringement; it not being liable, however, as an independent infringer.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 182½–186; Dec. Dig. § 129.*]

2. PATENTS (§ 26*)—OLD ELEMENTS—REARRANGEMENT—INVENTION.

Where a patentee took certain old elements and constructed a new apparatus, in which every element was to be found in one or other of some prior patent, but his rearrangement brought about a new invention and a new and useful apparatus, and it required inventive genius to reassemble such prior known elements and construct a complete workable machine, his invention was patentable.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. § 26.*]

3. PATENTS (§ 328*)—VALIDITY—GAS CLEANER.

Ernst patent No. 896,365 for a gas-washing apparatus, and No. 900,062 for the process, held to involve inventive genius, to be valid and infringed.

In Equity. Suit by the Coal & Coke By-Products Company against Alfred Ernst and others. Decree for complainant.

Kay & Totten, of Pittsburgh, Pa., for plaintiff.

Weil & Thorp and C. M. Clarke, all of Pittsburgh, Pa., for defendants.

YOUNG, District Judge. The bill is filed in this case for the infringement of two patents issued to Alfred Ernst, and by him assigned to the Coal & Coke By-Products Company. Of these patents No. 896,365 is dated August 18, 1908, and No. 900,062 is dated September 29, 1908. Of the defendants, Alfred Ernst is the above-named patentee, and he is a stockholder of and prominently connected with the operations of the Roessing-Ernst Company, a corporation, also a defendant, and the other defendant is the Best Manufacturing Company, a corporation.

The pleadings and the evidence show that the Roessing-Ernst Company contracted to furnish a certain gas-washing apparatus to the Macbeth-Evans Company, and that it let the contract for the building of it to the Best Manufacturing Company, furnishing that company with drawings and specifications. It is alleged that these drawings and specifications show an apparatus which is an infringement of plaintiff's patents, and that the apparatus as constructed by the Best Manufacturing Company is an infringement likewise.

[1] The record presents an anomalous case in this: Neither Ernst nor his company may set up the invalidity of the patent because Ernst, being the inventor of the apparatus, and the assignor to another, may not be permitted to impugn its validity. This also applies to the company with which Ernst has associated himself. It applies also to the other defendant, the Best Manufacturing Company, so far as the one machine is concerned, because the record shows that the Best Company cannot be an independent infringer; the degree of its participation in the alleged wrong being simply that of a constructor according to designs prepared and furnished to it by the other defendant. Inasmuch as the larger part of the evidence bears upon the prior art as anticipating or limiting the scope of the patents in suit, and has been argued by counsel fully, a defense which is available to the Best Company generally outside of this one machine, we shall here consider the defense of invalidity raised by the pleadings and evidence.

Let us have first clearly before us what the apparatus described by these patents is; for while one is for a process and the other is for an apparatus, they may easily and fully be considered together. The apparatus consists of an inverted cup placed within an upright casing, leaving a space between the outer wall of the inverted cup and the inner wall of the casing. The inverted cup is fixed to a shaft passing vertically through its center, so that it may be made to revolve inside of the outer casing. The apparatus is sealed at the top to prevent the escape of gas. The outer casing is built upon a foundation, and within this foundation is a space filled with water for the purpose of sealing the apparatus and preventing the escape of gas downwardly, and also for the purpose of catching and retaining the tar, ammonia, and other

by-products separated in the cleaning process. Within the inverted cup an upright cylinder is placed. This cylinder is built upon the foundation referred to, and projects upwards within the inverted cup almost to the top, and is of such diameter as to leave a space between it and the sides of the inverted cup. Upon the outsides of this last cylinder, and between it and the inside of the inverted cup, are fixed vanes or blades. On the inside of the inverted cup are fixed vanes or blades, and on the outside of the inverted cup and between it and the inside of the outer casing are fixed vanes or blades. On the inside of the outer casing are fixed vanes or blades. At the bottom of the apparatus there is a pipe for the admission of gas and one for the admission of water. At the top of the apparatus there is a pipe for the exit of the purified gas and a pipe for the admission of water into the apparatus. The following drawing shows the apparatus:

Fig. 1

The process is as follows: The gas is admitted hot into the bottom of the apparatus, and is met by a fine spray of water, saturating the gas. The gas then passes upwards through the open passage, and is diverted so as to pass downward between the inner cylinder and the inside of the revolving inverted cup, and in its passage, by centrifugal action and the beating action caused by the revolving blades and the obstructing blades, the water and gas are commingled, and the tar, ammonia, and other substances held in suspension are released and thrown against the inside of the inverted cup and find their way down into the reservoir below. The gas then turns upward between the outside of the inverted cup and the inside of the casing, and during its passage it meets with water which passes from ledges on the inside of the casing, and is also subjected to another beating, caused by the blades on the outside of the revolving cup and the blades on the inside of the outer casing. By the centrifugal action and beating the ascending gas and descending water are commingled, and the tar, ammonia, and other matters held in suspension are removed, the particles striking the inside of the outer casing and finding their way to the reservoir below.

We have carefully examined all of the patents introduced by the defendants for the purpose of showing the prior state of the art, and have also read and considered the evidence concerning the patents submitted by both plaintiff and defendants. Without discussing them in detail, we are satisfied that the evidence shows that every element set forth in the specifications and claims of the two patents in suit was old at the time of the granting of the patents. It clearly appears that the spraying of gas with water, or the bringing of gas into contact with water on its admission into the cleaning device, had been discovered and used before these patents were granted. Causing the gas to pass in one direction, either horizontally or vertically, and to meet the water passing in the opposite direction, was old. The treatment of gas by revolving fans and the beating of the gas saturated with water, so as to separate by centrifugal action the impurities or substances held in suspension, was old. The arrangement within gas-cleaning machines by which the gas on its passage toward the exit would be constantly meeting purer and cleaner water was old.

[2] What then did the plaintiff do? He took these old elements, and constructed a new apparatus, in which every element, or the suggestion of every element, is to be found in one or other of some patent before his. His invention consisted in taking these elements as he found them in the prior art, and by changing them, using their equivalents, bringing out a new function, and by rearranging them, thereby produced a new and useful apparatus. It required invention to take the disjecta membra which he found in many of the patents and from them construct and complete a workable machine. His patents are therefore valid as to the construction which the patentee has described and claimed, both as to the apparatus patent No. 896,365, and the process patent No. 900,062.

[3] Let us now see whether or not the defendants have infringed. It is a fair conclusion from the evidence that the machine designed and constructed by the defendants was designed by Alfred Ernst, the

patentee of the patents in suit, and that he brought to that task all the knowledge he had of the prior art and as set out in the two patents in suit. We find from an examination of the evidence, including the drawings of the infringing machine, that the infringing machine utilizes, just as the patents in suit do, as we have found, all the elements of the prior art. We have the three cylinders, namely, the outer casing resting on a foundation containing water, the inner cup fixed to a vertical shaft as the means of revolving it, sealed at the top, the inner cylinder within the inverted cup, resting on the foundation and continuing to almost the top of the inverted cup, forming an open passageway for the gas. The open space between these cylinders for the passage of the gas from its entrance at the bottom to its exit at the top. The innermost cylinder has on its inside walls spaced projections against which the gas and water are thrown by the fans or vanes on the prolonged shaft by which a beating action is caused. The inverted cup has on its outside fixed vanes or blades which revolve with that cylinder, and there are projections on the inside of the outer cylinder to obstruct or baffle the gas and water thrown against them by the blades. There are means for introducing the gas at the bottom; also means for introducing water to meet the gas on its last and upward passage. We have then all the material elements of the patent in suit, to which is added alone the placing of vanes on the prolonged shaft, and even this element is not new, for we have in $E'$ of the drawing of patent No. 896,365 the provision for blades extending from the top of the inverted cup into the open passage, but the blades in the infringing device are placed horizontally by attachment to the central shaft, while the patent provides for vertical blades. The process is similar, with some exceptions which we shall note. The gases are introduced at the bottom and caused to flow through the water at the bottom of the apparatus, but move upward through a serrated covering having V-shaped openings. As it passes through the water, the gas, being hot, takes up moisture, and when it passes through the serrated openings it meets with the equivalent of a spray caused by the bubbling action of the water and by water thrown on the serrated cover. As it passes up through the inner cylinder saturated with water, it is baffled or beaten by the fans upon the shaft opposed by the projections on the inside of the cylinder, and by centrifugal force and beating the tar, ammonia, and other substances held in suspension are separated and thrown against the inner side of the cylinder and find their way down to the reservoir below. The gas, somewhat cleansed, is then passed by the action of the fans on the shaft out of the inner cylinder into the space between the inner cylinder and the inside of the revolving cup. During this movement it meets with no obstruction, but passes through an open passage. The gas then turns from this passage upward, and passes between the outside of the inverted revolving cup and the inside of the outer casing. Here the gas meets with a descending current of water, and the water and gas are commingled by the action of the fans on the outside of the revolving cylinder, opposed by the projections on the inside of the outer casing, and by centrifugal action and the beating process the tar, ammonia, and other substances held

in suspension are thrown against the inside of the outer casing and find their way to the reservoir below. The difference in the process is that the gas is not met with the fine spray at its entrance but first passes through the water in the reservoir. The gas is beaten on its first upward movement, but is not beaten on its first downward passage, but is beaten and subjected to water on its last upward movement. This difference in arrangement is of course very slight. The only advantage would appear to be that it permits the gas to escape, coming in contact with the discharged tar, ammonia, etc., after being cleansed, a result that occurs in the patented process, as the gas in its downward course meets at the bottom the downflowing impurities. It appears to be a useful rearrangement but one involving no degree of inventive genius. Used as it is by the patentee, it certainly would not relieve him from the charge of infringement.

It appears conclusively to us that the whole apparatus and the process, as shown by the evidence, to be used by the defendants is an infringement of plaintiff's patents, and the defendants should be restrained perpetually from such infringement.